*Iraheta v. Montgomery County, Texas et al.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **FELIX IRAHETA,** | § |
| | § |
| *Plaintiff,* | § **Civil Action No.** <u>4:26-cv-01351</u> |
| | § |
| *v.* | § |
| | § **JURY TRIAL DEMANDED** |
| **MONTGOMERY COUNTY, TEXAS;** | § |
| **DEPUTY JOSEPH MICHAEL O'NEILL** | |

**MONTGOMERY COUNTY, TEXAS;**
**DEPUTY JOSEPH MICHAEL O'NEILL**
　(Badge/Unit 14838), in his individual capacity;
**DEPUTY NICHOLAS ANTHONY**
**SCINICARIELLO**
　(Badge 6067), in his individual capacity;
**SPECIALIST TIMOTHY J. BOEREMA**
　(Unit U1008), in his individual capacity;
**DEPUTY DAVIS (first name unknown)**
　(BWC 16104), in his individual capacity;
**JOHN DOE (BWC 13603),**
　in his individual capacity;
**JOHN DOE (BWC 15438),**
　in his individual capacity;
**JOHN DOE (BWC 14218),**
　in his individual capacity;
**SCENE JOHN DOE DEPUTIES 1–3,**
　in their individual capacities;
**HOSPITAL JOHN DOE DEPUTY 1,**
　in his individual capacity;
**JAIL JOHN DOE OFFICERS 1–2,**
　in their individual capacities,

　　　*Defendants.*

## PLAINTIFF'S ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

*Iraheta v. Montgomery County, Texas et al.*

## PRELIMINARY STATEMENT

1.    This federal civil-rights action arises from a forcible vehicle extraction, subsequent custodial force, and deliberate indifference to a serious medical need inflicted upon Plaintiff Felix Iraheta ("Plaintiff") by deputies of the Montgomery County Sheriff's Office ("MCSO") acting under color of state law on February 20, 2024, and into the early morning hours of February 21, 2024.

2.    Plaintiff does not challenge Montgomery County's authority to investigate suspected driving while intoxicated. He challenges the ***manner*** in which deputies converted a controlled, nonviolent traffic encounter on the internal loop road of The Woodlands Market Street (9595 Six Pines Drive), a confined retail roadway with frequent stop controls, into a catastrophic orthopedic injury through a high-leverage extraction technique, and then compounded the harm through continued force and custodial interference with medical stabilization while Plaintiff remained in continuous custody.

3.    The extraction produced a left glenohumeral dislocation and fracture of the left humerus/greater tuberosity diagnosed within hours at Memorial Hermann–The Woodlands Hospital and ultimately requiring operative repair and prolonged rehabilitation. Plaintiff alleges these injuries were caused by objectively unreasonable force applied by Defendant O'Neill and Defendant Scinicariello, and were

exacerbated by subsequent custodial handling and medical-care interference after the injury was obvious.

4.    This action also asserts municipal liability against Montgomery County. Plaintiff alleges the constitutional violations were the foreseeable result of County policy choices and customs, including a DWI arrest-volume incentive structure and training/supervision decisions that elevated high-output deputies into training-adjacent roles, such that unconstitutional escalation and high-risk extraction tactics predictably recur in routine, low-threat encounters.

5.    On information and belief, MCSO created and maintains body-worn camera recordings, in-car video and audio recordings, dispatch/AVL records, and related reports for the incident and custody sequence described herein, and those materials are within Defendants' possession, custody, or control. Plaintiff will seek those materials in discovery.

6.    Plaintiff pleads this action to ensure it may be adjudicated without requiring any determination that any criminal disposition is invalid. Plaintiff's claims are limited to the manner and degree of force used, the post-injury custodial conduct, and the alleged interference with medical stabilization and care. These force claims are temporally and conceptually distinct from any criminal disposition and do not challenge the legality of the stop, the arrest, or the blood-search warrant.

*Iraheta v. Montgomery County, Texas et al.*

7.   Plaintiff seeks compensatory damages, punitive damages against individual Defendants (not the County), attorney's fees and costs to the extent permitted by law, interest, and such other relief as the Court deems just.

## I. PARTIES

### A. Plaintiff

8.   Plaintiff Felix Iraheta is an adult resident of Montgomery County, Texas. At all relevant times, Plaintiff was approximately 47 years old, approximately 5'6″ tall, and approximately 165 pounds.

### B. Municipal Defendant

9.   Defendant Montgomery County, Texas ("County") is a political subdivision in Texas and is responsible for the policies, customs, training, supervision, and operational practices of the Montgomery County Sheriff's Office relevant to this action. Plaintiff seeks to hold the County liable only for its own conduct, its policies, customs, training/supervision decisions, and deliberate choices, rather than vicarious liability for employee conduct.

### C. Individual Defendants

10.   **Defendant Deputy Joseph Michael O'Neill (Badge/Unit 14838)** is a peace officer employed by MCSO. He is sued in his individual capacity. Plaintiff alleges O'Neill initiated and executed the vehicle extraction; maintained custodial

*Iraheta v. Montgomery County, Texas et al.*

control during transport; directed and participated in hospital custodial handling including hallway movement and bed restraint; supervised and physically participated in compelled blood-evidence procedures; and controlled discharge and transport to jail. On information and belief, O'Neill possessed advanced emergency medical training (including paramedic credentials), which is relevant to foreseeability of orthopedic injury and awareness of exacerbation risks from continued manipulation and forced positioning.

11.     **Defendant Deputy Nicholas Anthony Scinicariello (Badge 6067)** is a peace officer employed by MCSO. He is sued in his individual capacity. Plaintiff alleges Scinicariello physically participated in the extraction, including positioning at or near the passenger-side door-frame/B-pillar area and applying leveraged force against Plaintiff's left upper extremity in coordination with O'Neill's pulling force from the driver side.

12.     **Defendant Specialist Timothy J. Boerema (Unit U1008)** is a peace officer acting under color of state law at the scene. He is sued in his individual capacity. Plaintiff alleges Boerema initiated the stop, remained present in close proximity during the post-injury period, observed the scene's controlled nature and Plaintiff's obvious injury, and had realistic opportunities after the injury to request medical aid and to intervene to stop continued unreasonable force.

*Iraheta v. Montgomery County, Texas et al.*

13.    **Defendant Deputy Davis (first name unknown) (BWC 16104)** is a peace officer employed by MCSO. He is sued in his individual capacity. Plaintiff alleges Davis was present during the custodial chain, including at the hospital, and had realistic opportunities after the injury to intervene, de-escalate, and/or secure medical stabilization.

### D. BWC-Identified Doe Defendants

14.    **Defendant John Doe (BWC 13603)** is an MCSO deputy whose true name is presently unknown. He is sued in his individual capacity. Plaintiff alleges this deputy was present at the scene, observed the extraction and post-injury handling, and had realistic opportunities to intervene and/or request medical assistance after Plaintiff's injury became obvious.

15.    **Defendant John Doe (BWC 15438)** is an MCSO deputy whose true name is presently unknown. He is sued in his individual capacity. Plaintiff alleges this deputy was positioned at the passenger side of Plaintiff's vehicle, observed the pre-extraction calm and the subsequent extraction and injury, and had realistic opportunities to intervene and/or request medical assistance after Plaintiff's injury became obvious.

16.    **Defendant John Doe (BWC 14218)** is an MCSO deputy whose true name is presently unknown. He is sued in his individual capacity. Plaintiff alleges this

deputy was present at the scene, observed the post-injury handling and Plaintiff's obvious distress, and had realistic opportunities to intervene and/or request medical assistance.

### *E. Additional Doe Defendants (Grouped by Location and Opportunity to Act)*

17.　**Scene John Doe Deputies 1–3** are deputies/officers whose names are presently unknown. They are sued in their individual capacities. Plaintiff alleges they were present at or near Market Street during the post-injury period and had realistic opportunities to intervene, request medical assistance, or stop continued unreasonable force after Plaintiff's injury became obvious.

18.　**Hospital John Doe Deputy 1** (the deputy who warned Plaintiff in the emergency department hallway that noncompliance would "further injure" his shoulder) is an MCSO deputy whose true name is presently unknown. He is sued in his individual capacity. Plaintiff alleges this deputy was present at both the scene and at Memorial Hermann–The Woodlands Hospital, and that his verbal warning immediately before Plaintiff was forcibly moved down the hospital hallway demonstrates actual awareness of Plaintiff's serious orthopedic injury and of the risk that forceful movement would worsen it. Plaintiff alleges this deputy had realistic opportunities to intervene, de-escalate, and prevent continued unreasonable force and/or interference with medical stabilization, but failed to do so.

*Iraheta v. Montgomery County, Texas et al.*

19.    **Jail John Doe Officers 1–2** are detention officers whose names are presently unknown. They are sued in their individual capacities. Plaintiff alleges they received Plaintiff into custody after hospital discharge and, despite obvious injury and the need for immobilization/stabilization, failed to provide adequate intake screening and accommodations, continuing the chain of deliberate indifference.

20.    Plaintiff will amend this Complaint to substitute the true names of the Doe Defendants once identified through discovery.

## II. JURISDICTION AND VENUE

21.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) and (4) because Plaintiff asserts claims under 42 U.S.C. § 1983 for the deprivation of rights, privileges, and immunities secured by the Constitution and laws of the United States.

22.    This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over any related state-law claims that form part of the same case or controversy.

23.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Montgomery County, Texas, within the Houston Division of the Southern District of Texas, and because Defendants reside in this District.

*Iraheta v. Montgomery County, Texas et al.*

## III. FACTUAL ALLEGATIONS

*A. The Stop Context: Confined Market Street Internal Roadway and Immediate Containment*

24.    On the evening of February 20, 2024, at approximately 10:45 p.m., Plaintiff departed Uni Sushi within The Woodlands Market Street retail district at or near 9595 Six Pines Drive, The Woodlands, Texas, and drove a short distance within the same complex.

25.    Market Street's internal roadway is a confined loop road with frequent stop controls and constrained routes due to storefronts, curbs, and short block distances. The total distance from Plaintiff's departure point to the stop location was approximately 1,400 feet, entirely within the Market Street complex.

26.    Specialist Boerema, working an off-duty "extra job" assignment at Market Street in an unmarked vehicle, initiated a stop after observing Plaintiff's vehicle strike a traffic cone and drag it. No objective speed-measurement device was used.

27.    Plaintiff's vehicle came to a stop within Market Street. The surface conditions were described in the arrest paperwork as flat, level, hard, dry, and free of debris. The vehicle was stationary and Plaintiff remained seated in the driver's seat.

*Iraheta v. Montgomery County, Texas et al.*

28.    Boerema requested backup. By the time Deputy O'Neill arrived and made contact, the scene had become saturated with law enforcement resources. At least six marked patrol SUVs and Boerema's unmarked unit were present. Deputies stood in a loose perimeter and the vehicle was effectively boxed in. Plaintiff alleges there was no plausible route of flight and no exigency requiring immediate high-risk physical intervention.

29.    Plaintiff was attempting to contact his wife to arrange a ride home.

### B. The Escalation Decision and Two-Officer Extraction

30.    Deputy O'Neill made contact and questioned Plaintiff briefly. Plaintiff declined to answer certain questions and declined to exit the vehicle.

31.    Rather than employ measured de-escalation and time, and despite the controlled perimeter and abundant staffing, O'Neill announced an intent to forcibly remove Plaintiff, issued a rapid verbal countdown, and, before Plaintiff could meaningfully comply, initiated the physical extraction. The interval between the verbal countdown and the initiation of physical force was too brief for voluntary compliance.

32.    Deputy Scinicariello positioned near the passenger-side door-frame/B-pillar area in advance of the extraction, consistent with a coordinated two-officer technique.

*Iraheta v. Montgomery County, Texas et al.*

33.    The extraction occurred rapidly. O'Neill unlocked the door, opened it, manipulated the seatbelt, and both O'Neill and Scinicariello seized Plaintiff's left arm.

34.    The deputies used the rigid vehicle frame as a mechanical leverage point as they pulled and torqued Plaintiff's left upper extremity while Plaintiff's torso remained partially constrained by the seat/door frame geometry.

35.    Plaintiff suffered an immediate, acute left shoulder dislocation with associated fracture. He audibly cried out and thereafter exhibited signs consistent with severe pain and functional incapacity.

36.    Plaintiff alleges that the mechanism of injury was foreseeable: forceful abduction/external rotation of an upper extremity against a fixed fulcrum, while the torso is constrained, elevates the risk of glenohumeral dislocation and proximal humerus fracture.

### C. Post-Injury Handling at the Scene: Continued Force After Injury Becomes Obvious

37.    After the extraction, Plaintiff was pulled/forced to the ground and then brought to standing for handcuffing. Plaintiff alleges his "tensing" during this period reflected involuntary protective response to acute orthopedic trauma, not assaultive resistance.

*Iraheta v. Montgomery County, Texas et al.*

38.    Scinicariello applied additional pressure to maintain leverage during handcuffing, increasing pain and risk of worsening injury.

39.    Plaintiff was placed into O'Neill's patrol SUV while handcuffed behind his back despite the obvious upper-extremity injury. O'Neill used pushing force to seat him and warned of additional charges if Plaintiff did not move quickly enough.

40.    During the post-injury period at the scene, multiple deputies remained nearby. Plaintiff alleges a casual atmosphere among officers, while Plaintiff sat handcuffed in acute pain. Plaintiff alleges observing deputies had realistic opportunities to summon medical assistance and to intervene to stop continued unreasonable force after the injury became obvious.

**D. Transport to Hospital: Pain Complaints and Suppression by Loud Music**

41.    During transport, Plaintiff repeatedly complained that his shoulder was injured and "not right," and attempted to get the attention of the transporting officer.

42.    O'Neill acknowledged the complaints but then increased the volume of music and continued custodial processing activities, with the foreseeable effect of suppressing Plaintiff's ability to communicate medical distress.

**E. Hospital Arrival: Obvious Injury and Custodial Control**

43.     Plaintiff arrived at the emergency department. The shoulder deformity was obvious upon arrival and immediately apparent to reasonable observers.

44.     Hospital triage documentation reflected that Plaintiff arrived in police custody with a suspected left shoulder dislocation and required medical clearance. Nursing documentation reflected escalating pain scores and documented inability to move the left shoulder.

45.     O'Neill later characterized the injury as first noticed at the hospital; however, the recordings demonstrate repeated complaints during transport and obvious distress shortly after extraction.

### F. Sedation/Analgesia Sequence (Fact-Plus-Inference Allegations, Consistent with the Medical Record)

46.     The medical record reflects that the treating physician performed a closed reduction of the dislocated shoulder without procedural sedation, and that the chart contains documentation reflecting a refusal of IV sedation. Plaintiff disputes that documentation to the extent it implies an informed, voluntary refusal under coercive custody conditions.

47.     The medical record further reflects that oral pain medication was administered in the emergency department. Plaintiff alleges that the analgesia

*Iraheta v. Montgomery County, Texas et al.*

provided was limited in relation to the severity of the injury and the anticipated pain of reduction and post-reduction custody handling.

48.   On information and belief, based on (i) the custody context and contemporaneous evidentiary objectives; (ii) the charted absence of procedural sedation; and (iii) Plaintiff's dispute of the refusal documentation, custodial priorities influenced the options presented and/or the sequence of pain-management decisions relative to compelled evidence collection. Discovery will confirm or refute this inference through medication administration records, orders and timestamps, nursing notes, physician orders, and testimony of staff and deputies.

### G. Hospital Hallway Movement: Threats, Dragging, and Bed Restraint

49.   In the emergency department hallway, while visibly injured and attempting to comply with medical instructions, Plaintiff was ordered to move immediately under threat of being carried.

50.   Hospital John Doe Deputy 1 warned that noncompliance would further injure his shoulder, demonstrating knowledge of the injury and awareness of the risk that forceful movement would worsen it.

51.   O'Neill then used immediate physical force to propel Plaintiff down the hallway while Plaintiff pleaded for the officer to stop and complained about his shoulder.

*Iraheta v. Montgomery County, Texas et al.*

52.    O'Neill and at least one assisting deputy forced Plaintiff onto a hospital bed, restrained him, and applied control force despite the absence of assaultive resistance.

### H. Compelled Blood Draw: Restraint and Weight-Based Control

53.    O'Neill obtained a blood-search warrant as affiant.

54.    A registered nurse obtained a blood specimen from Plaintiff's right hand. O'Neill applied restraint force, including bodyweight and two-arm pressure, despite no necessity communicated by medical staff.

55.    Plaintiff alleges any movement labeled "resistance" was consistent with involuntary pain response by a person with an acute dislocation/fracture, rather than purposeful aggression.

### I. Diagnosis and Emergency Treatment

56.    Plaintiff was diagnosed by Dr. Kevin Patrick Beres, DO, on February 21, 2024, with a left shoulder dislocation and humerus/greater tuberosity fracture. Dr. Beres performed a closed reduction. The record reflects that immobilization by sling was ordered and that a sling/splint was applied to Plaintiff's left upper extremity. Plaintiff's total time in the emergency department, during which he underwent closed reduction of a dislocated shoulder with associated fracture, received limited

*Iraheta v. Montgomery County, Texas et al.*

oral analgesia, was subjected to a compelled blood draw, and was processed for custodial discharge, was approximately two hours.

### J. Denial of Sling, Removal of Monitors, and Forced Discharge

57.    O'Neill woke Plaintiff at discharge and directed his removal to jail.

58.    O'Neill interfered with medical stabilization at discharge. The emergency-department record reflects that the treating physician ordered immobilization by sling and that a sling/splint was applied as part of the discharge process. Discharge materials associated with that visit likewise reflect the need for immobilization and follow-up for the fracture/dislocation. When Plaintiff requested the physician-ordered sling, O'Neill verbally refused and stated that a sling was "not for pain management," thereby substituting his own custodial judgment for the treating physician's medical directive. Despite the documented sling order and application, O'Neill removed Plaintiff from the emergency department without ensuring Plaintiff left in the ordered sling/immobilization, removed monitoring equipment, denied Plaintiff's request to see the physician again, re-handcuffed Plaintiff, a post-reduction patient with a freshly reduced shoulder dislocation and fracture, and controlled the timing and manner of departure in police custody. The discharge sheet bore a handwritten notation "Cleared for jail" despite the accompanying discharge instructions prescribing immobilization, orthopedic follow-

up, and pain management for diagnosed fracture and dislocation. The Montgomery

County Jail later received and possessed the same hospital discharge paperwork as

part of the intake/outside-records stream, underscoring that immobilization was not

an unknown or undocumented need.

### K. Jail Booking: Deliberate Indifference at Intake

59.    Plaintiff was transported to the Montgomery County Jail. At the time of

intake, Plaintiff was visibly injured, having just been discharged from the ER with a

major orthopedic injury.

60.    Plaintiff alleges that intake screening for obvious medical needs was

inadequate. The jail medical record system reflects the absence of routine intake-

screening documentation (including missing or unpopulated intake screening and

related medical forms) for Plaintiff's booking. Plaintiff alleges that this

documentation gap is consistent with a failure to appropriately assess, document,

and accommodate an obvious serious orthopedic injury at intake, including failure to

ensure immobilization and appropriate custody medical follow-up.

### L. Subsequent Medical Treatment and Surgical Repair

61.    On February 22, 2024, Plaintiff returned to Memorial Hermann–The

Woodlands Hospital emergency department with severe left shoulder pain. Medical

documentation from that visit reflected Plaintiff's report that he had been discharged

in police custody and had not been given discharge instructions or a sling. The treating physician on February 22, 2024 prescribed pain medication and provided a correctly sized sling, and documented a dispute regarding whether Plaintiff refused IV sedation on the prior visit.

62.    Plaintiff later received orthopedic evaluation confirming displaced fracture characteristics requiring surgical intervention.

63.    Plaintiff underwent ORIF surgery. The surgical procedure involved open reduction of displaced fracture fragments, internal fixation hardware, and rotator cuff repair, resulting in permanent internal hardware and an approximately eight-inch surgical scar. Plaintiff underwent prolonged physical therapy and rehabilitation, and continues to experience pain, limited range of motion, and functional impairment.

## M. Awards/Trophies, Incentives, and Institutional Reinforcement (Monell Factual Context)

64.    The Montgomery County District Attorney's Office hosts an annual Vehicular Crimes Awards ceremony recognizing deputies and agencies for DWI enforcement volume. O'Neill was a repeated recipient: he received an Honorable Mention at the March 9, 2023 ceremony for calendar year 2022, during which he made 88 DWI arrests, constituting approximately 20% of MCSO's total 439 DWI

*Iraheta v. Montgomery County, Texas et al.*

arrests countywide. He received "DWI Officer of the Year" at the April 12, 2024 ceremony for calendar year 2023, after both the June 2023 Ramsey incident and the February 2024 events at issue in this action. He received "DWI Officer of the Year" a second time at the February 13, 2025 ceremony for calendar year 2024. MCSO itself was named "DWI Agency of the Year" at the 2023 ceremony.

65.    Then-District Attorney Brett Ligon personally hosted and presented at the Vehicular Crimes Awards ceremonies, and then-Sheriff Rand Henderson led MCSO during the periods in which O'Neill's arrest volumes were highlighted and rewarded. The February 13, 2025 ceremony occurred shortly after new Sheriff Wesley Doolittle assumed office on January 1, 2025, with O'Neill's award presented under the MCSO banner; the press release for that ceremony listed First Assistant District Attorney Mike Holley, who subsequently became District Attorney on October 29, 2025, as a contact. No public announcement has discontinued the awards program.

### N. Defendant O'Neill's Pattern of Force and County Notice (Pre-Incident Notice Allegations)

66.    On June 30, 2023, approximately eight months before the events giving rise to this action, O'Neill was involved in a substantially similar high-leverage extraction incident in The Woodlands involving leveraged control force against a

*Iraheta v. Montgomery County, Texas et al.*

non-threatening subject. That incident later became the subject of federal civil rights litigation captioned Ramsey v. Montgomery County, filed in June 2025. While the Ramsey civil litigation postdates the events at issue here, the underlying incident occurred in 2023, and upon information and belief, the County's mandatory use-of-force reporting and internal review procedures required supervisory evaluation of that incident at or near the time it occurred. Accordingly, Plaintiff alleges the County possessed actual or constructive knowledge, prior to February 2024, that O'Neill had employed dangerous extraction techniques against a non-threatening subject and that such techniques posed a foreseeable risk of serious injury.

67.    Plaintiff alleges that despite the June 2023 Ramsey incident and the internal review opportunities it triggered, the County failed to retrain, restrict, decertify, or discipline O'Neill, failed to modify its extraction protocols or field-training designations, and instead continued to deploy O'Neill in the same specialized DWI enforcement and field-training role in which the challenged conduct in this action occurred.

### O. Recording Discontinuities

68.    Across multiple body-worn camera and patrol-vehicle recordings, the audio/video feeds reflect discontinuities at critical moments, including muting or reduced audio capture and instances of blurring or missing segments. Plaintiff alleges

*Iraheta v. Montgomery County, Texas et al.*

these discontinuities warrant forensic review of original files and metadata, production of native-format recordings, and preservation of audit logs to determine the cause and scope of the discontinuities and to ensure a complete evidentiary record.

### P. Bridge: Constitutional Framework for Post-Extraction Force (Fourth vs. Fourteenth Amendment Alternative Pleading)

69.     Plaintiff pleads the post-extraction use of force in the alternative to avoid any artificial forfeiture based on how the Court characterizes the custody stage. Each post-extraction episode of force described below is alleged to be independently unconstitutional under the circumstances existing at the time it occurred, without reference to whether the initial extraction was lawful or unlawful. The force used after the extraction, including post-injury handling at the scene, transport-related coercive measures, and the emergency-department hallway and bed-restraint force, occurred while Plaintiff remained continuously seized and under arrest authority, such that the conduct is actionable as unreasonable force during a seizure. Alternatively, to the extent the Court concludes the arrest was complete before the hospital phase and Plaintiff's status had transitioned to that of a pretrial detainee, the same hospital-phase force constitutes objectively unreasonable force prohibited by due process. Under either framework, Defendants were required to tailor any force

*Iraheta v. Montgomery County, Texas et al.*

to the actual governmental interest present in a controlled setting and to account for Plaintiff's known and obvious orthopedic injury.

### Q. Chronology of Force and Medical Interference

70.    Relevant body-worn camera recordings, patrol-vehicle interior recordings, CAD/dispatch logs, jail intake records, and hospital records contain timestamps and contemporaneous data that will corroborate the sequence, duration, and circumstances of the events alleged in this Complaint. Plaintiff will develop the evidentiary basis for each allegation through discovery of these materials and related records within Defendants' possession, custody, or control.

71.    Vehicle Extraction (approximately 10:51 p.m., February 20, 2024). O'Neill issued a rapid verbal countdown and, with Scinicariello positioned at the rear driver's side at 7 o' clock  at the B-pillar, forcibly extracted Plaintiff from the vehicle. The extraction produced an immediate left shoulder dislocation and fracture. (Actionable under Counts I, II, and VII.)

72.    Post-Extraction Ground Custody and Handcuffing (immediately following extraction). Plaintiff was forced to the ground and handcuffed behind his back despite obvious upper-extremity injury. Scinicariello applied additional pressure during handcuffing. Multiple deputies observed the injury and failed to summon medical assistance. (Actionable under Counts I, II, and VI.)

*Iraheta v. Montgomery County, Texas et al.*

73.     Placement in Patrol Vehicle Under Threat (shortly after handcuffing). O'Neill used pushing force to seat Plaintiff in the patrol SUV while handcuffed behind his back, warning of additional charges if Plaintiff did not move quickly enough. (Actionable under Counts I and V.)

74.     Transport: Pain Complaints Suppressed by Loud Music (during transport to Memorial Hermann). Plaintiff repeatedly complained his shoulder was injured. O'Neill acknowledged the complaints, then increased music volume with the foreseeable effect of suppressing Plaintiff's ability to communicate medical distress. (Actionable under Count V.)

75.     Emergency Department Hallway Force (upon arrival at Memorial Hermann–The Woodlands Hospital). Hospital John Doe Deputy 1 warned that noncompliance would "further injure" Plaintiff's shoulder. O'Neill then used physical force to propel Plaintiff down the hallway while Plaintiff pleaded for the officer to stop. (Actionable under Counts III, IV, V, and VI.)

76.     Forced Bed Restraint and Blood Draw (inside the emergency department). O'Neill and at least one assisting deputy forced Plaintiff onto a hospital bed and restrained him. During a compelled blood draw, O'Neill applied bodyweight and two-arm pressure despite no necessity communicated by medical staff. (Actionable under Counts III, IV, and V.)

*Iraheta v. Montgomery County, Texas et al.*

77.   Denial of Sling and Override of Physician's Directive (at discharge). O'Neill refused Plaintiff's request for the physician-ordered sling, stating it was "not for pain management." O'Neill removed monitoring equipment, denied Plaintiff's request to see the physician again, and re-handcuffed a post-reduction patient. The discharge sheet bore a handwritten notation "Cleared for jail" despite instructions prescribing immobilization and orthopedic follow-up. (Actionable under Count V.)

78.   Forced Hospital Discharge and Transport to Jail (early morning, February 21, 2024). O'Neill woke Plaintiff and directed removal to jail. Plaintiff stated he was cooperating and complying; O'Neill pushed Plaintiff through the hospital and into the patrol SUV without the ordered immobilization device. (Actionable under Counts III, IV, and V.)

79.   Jail Intake Without Medical Accommodation (following transport). Jail officers received Plaintiff into custody with obvious orthopedic injury and hospital discharge paperwork prescribing immobilization, yet failed to provide adequate intake screening or stabilization accommodations. (Actionable under Count V.)

*Iraheta v. Montgomery County, Texas et al.*

## IV. CAUSES OF ACTION

### COUNT I

**Fourth Amendment Excessive Force: Extraction and Immediate Post-Injury Handling**

*(Against Defendant O'Neill)*

80.    Plaintiff incorporates by reference all preceding paragraphs.

81.    The Fourth Amendment prohibits unreasonable seizures. Excessive force claims during a seizure are analyzed under the Fourth Amendment's objective reasonableness standard, considering the totality of circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

82.    O'Neill initiated and executed a high-leverage vehicle extraction against a stationary, non-fleeing occupant on a confined retail roadway, in a scene already saturated with law enforcement resources. Plaintiff was not threatening officers, was not armed, and had no means of flight. Plaintiff alleges the governmental interest in immediate forcible extraction was minimal.

83.    Plaintiff alleges O'Neill used the rigid vehicle frame as a mechanical leverage point against Plaintiff's left upper extremity, causing an immediate shoulder dislocation and fracture, a catastrophic orthopedic injury requiring surgical repair.

*Iraheta v. Montgomery County, Texas et al.*

84.    After the extraction, O'Neill continued to apply force during post-injury handling, including forcing Plaintiff into a patrol vehicle while handcuffed behind his back despite the obvious upper-extremity injury. Plaintiff alleges this continued force was objectively unreasonable.

85.    As a direct and proximate result of Defendant O'Neill's objectively unreasonable force, Plaintiff suffered the injuries and damages described herein.

## COUNT II
### Fourth Amendment Excessive Force: Extraction Participation and Post-Injury Handling
### *(Against Defendant Scinicariello)*

86.    Plaintiff incorporates by reference all preceding paragraphs.

87.    Scinicariello physically participated in the extraction by positioning at or near the rear driver-side door-frame/B-pillar area and applying leveraged force against Plaintiff's left upper extremity in coordination with O'Neill's pulling force from the driver side. Plaintiff alleges Scinicariello's participation was integral to the mechanism that caused the shoulder dislocation and fracture.

88.    Scinicariello applied additional pressure during post-extraction handcuffing despite Plaintiff's obvious injury. Plaintiff alleges this continued force was objectively unreasonable.

*Iraheta v. Montgomery County, Texas et al.*

89.   As a direct and proximate result of Defendant Scinicariello's objectively unreasonable force, Plaintiff suffered the injuries and damages described herein.

## COUNT III

### Fourth Amendment Excessive Force: Post-Extraction Force Through Hospital Custody

***(Against Defendants O'Neill, Davis, and Hospital John Doe Deputy 1)***

90.   Plaintiff incorporates by reference all preceding paragraphs.

91.   After the extraction and during continuous seizure, Defendants O'Neill, Deputy Davis, and Hospital John Doe Deputy 1 applied and/or assisted in applying force against Plaintiff in the emergency department, including hallway movement under threat, physical propulsion while Plaintiff pleaded for the officer to stop, forced bed restraint, and weight-based control during the blood-draw procedure. Plaintiff alleges this force was applied while Plaintiff was visibly injured, compliant, and posed no threat to officer safety.

92.   To the extent any Hospital John Doe did not personally apply force, Plaintiff pleads that officer's liability under Count VI for failure to intervene after the injury and force became obvious.

93.   As a direct and proximate result, Plaintiff suffered additional pain, exacerbation of his orthopedic injury, and the injuries and damages described herein.

*Iraheta v. Montgomery County, Texas et al.*

## COUNT IV

### Alternative: Fourteenth Amendment Excessive Force, Hospital Phase
### *(Against Defendants O'Neill, Davis, and Hospital John Doe Deputy 1)*

94.    Plaintiff incorporates by reference all preceding paragraphs.

95.    In the alternative, to the extent the Court determines that the incidents of arrest were complete prior to the hospital phase and that Plaintiff's status had transitioned to that of a pretrial detainee, the Due Process Clause supplies the constitutional basis for the excessive-force analysis.

96.    Under the Due Process Clause, a pretrial detainee need show only that force purposely or knowingly used was objectively unreasonable.

97.    Plaintiff alleges the hospital-phase force described in Count III was objectively unreasonable under any applicable constitutional standard.

## COUNT V

### Deliberate Indifference to Serious Medical Needs
### *(Against Defendants O'Neill, and Applicable Hospital/Jail Defendants)*

98.    Plaintiff incorporates by reference all preceding paragraphs.

99.    Deliberate indifference to serious medical needs violates the Constitution; negligence or malpractice is insufficient, and intentional interference with prescribed treatment may support liability.

100.    To establish deliberate indifference, Plaintiff must show that the defendant knew of and disregarded a substantial risk of serious harm. For episodic

acts/omissions claims by pretrial detainees in this Circuit, the governing framework applies subjective deliberate indifference.

101.    Plaintiff's shoulder dislocation and fracture constituted an objectively serious medical need. Defendant O'Neill was subjectively aware of the risk of serious harm: the deformity and functional impairment were visible; Plaintiff repeatedly complained of pain; O'Neill acknowledged the injury; and O'Neill possessed advanced medical training relevant to awareness of exacerbation risk.

102.    Despite this knowledge, Plaintiff alleges O'Neill continued coercive custody measures that increased pain and risk, suppressed Plaintiff's medical distress communications through loud music during transport, and interfered with medical stabilization by removing monitoring equipment, denying implementation of physician-ordered immobilization, forcing discharge into police custody, and re-handcuffing a post-reduction patient. When Plaintiff stated on camera that O'Neill had caused his injury, O'Neill responded by directing Plaintiff to "exercise your right to remain silent." Viewed in context, Plaintiff alleges this statement occurred during a continuous course of custodial control in which Plaintiff's attempts to report injury and obtain stabilization were met with restrictive custodial responses, and it foreseeably discouraged further contemporaneous verbal reporting of pain, injury causation, and medical needs while Plaintiff remained in custody.

103.    Plaintiff further alleges that Jail John Doe Officers 1–2 had actual awareness of Plaintiff's obvious serious orthopedic injury and discharge materials and nonetheless failed to provide adequate screening and immobilization/stabilization accommodations.

104.    These acts and omissions constituted deliberate indifference to Plaintiff's serious medical needs. As a direct and proximate result, Plaintiff suffered additional pain, delayed treatment, exacerbation of injury, and the damages described herein.

## COUNT VI

### Failure to Intervene: Post-Injury Handling

***(Against Defendants Boerema, Davis, Scene Does, and Hospital John Doe Deputy 1)***

105.    Plaintiff incorporates by reference all preceding paragraphs.

106.    Officers who are present at the scene of a constitutional violation and have a realistic opportunity to intervene to prevent the harm but fail to do so may be held liable under federal civil-rights law.

107.    Defendants Boerema, Davis, Scene John Doe Deputies, and Hospital John Doe Deputy 1 were present during the post-injury period, including post-extraction handling, transport, and hospital custody, and observed or should have observed Plaintiff's obvious injury, repeated pain complaints, and the use of continued unreasonable force and medical interference by other defendants.

*Iraheta v. Montgomery County, Texas et al.*

108.     Each of these defendants had realistic opportunities to request medical assistance, to intervene to stop continued unreasonable force, and to prevent interference with medical stabilization, including by summoning medical staff, requesting a supervisor, objecting to continued force, or physically interposing to prevent further unnecessary restraint. None did so.

109.     Their failure to intervene violated Plaintiff's constitutional rights and caused the injuries and damages described herein.

**COUNT VII**

**Monell Municipal Liability**

***(Against Defendant Montgomery County, Texas)***

110.     Plaintiff incorporates by reference all preceding paragraphs.

111.     Montgomery County is liable only for its own policies, customs, and deliberate choices that were the moving force behind the constitutional violations alleged, and not on a respondeat superior theory. Municipal fault and causation must be applied with rigor to ensure the County is held liable only for its own deliberate conduct.

112.     Plaintiff alleges that, at the time of the events, the County, acting through the Sheriff's Office chain of command and officials with final or delegated authority over training, field-training designations, supervision, and specialized DWI enforcement, maintained an institutional framework that rewarded DWI arrest

volume and treated quantitative productivity as a primary measure of deputy performance. Specifically, the Montgomery County District Attorney's Office hosted an annual "Vehicular Crimes Awards" ceremony honoring officers and agencies for high-volume DWI enforcement. O'Neill was a repeated recipient of these awards: he received an Honorable Mention at the March 9, 2023 ceremony for calendar year 2022 performance, during which public records reflect he made 88 DWI arrests, constituting approximately 20% of MCSO's total 439 DWI arrests countywide. He received "DWI Officer of the Year" at the April 12, 2024 ceremony for calendar year 2023 performance, an award conferred after both the June 2023 Ramsey incident and the February 2024 events at issue in this action. He received "DWI Officer of the Year" a second time at the February 13, 2025 ceremony for calendar year 2024 performance. MCSO itself was named "DWI Agency of the Year" at the 2023 ceremony. These awards were publicly presented by officials with final policymaking authority: then-District Attorney Brett Ligon personally hosted and presented at the ceremonies, and then-Sheriff Rand Henderson led MCSO during the periods in which O'Neill's arrest volumes were highlighted and rewarded.

113.    Plaintiff alleges that this incentive structure and training environment operated in tandem: deputies identified as high-output DWI producers were

elevated, publicly honored by policymakers with final authority, and treated as institutional exemplars whose tactics were to be emulated. The awards program celebrated officers who went "above and beyond" in DWI enforcement without apparent scrutiny of the methods employed to achieve those arrest volumes. Field training and on-scene instruction reinforced rapid escalation as normative, and trainees observed and learned tactics during live encounters. Plaintiff alleges the County's failure to implement constitutionally meaningful guardrails for escalation decisions and extraction tactics in contained, low-threat settings was a foreseeable consequence of this framework, which prioritized volume over constitutional compliance and elevated the very deputies most likely to employ high-risk extraction techniques.

114.    The County is also liable under a failure-to-train/supervise theory to the extent its training and supervision were constitutionally deficient, the deficiency reflected deliberate indifference to the rights of persons with whom deputies come into contact, and the deficiency was closely related to and a moving force behind Plaintiff's injury.

115.    Upon information and belief, to be confirmed through discovery, the County's training materials, field-training evaluation protocols, and use-of-force review procedures for vehicle extractions and post-injury custody handling are

within the County's exclusive possession. Plaintiff alleges that these materials will reveal constitutionally deficient instruction on de-escalation alternatives to forcible extraction in contained, low-threat settings; the management of suspects with obvious orthopedic injuries during transport, hospital custody, and discharge; the obligation to defer to physician-ordered medical treatment rather than substituting custodial judgment; and post-injury reporting and reassessment requirements. Plaintiff further alleges that these deficiencies are not isolated gaps but reflect a pattern of deliberate indifference to the recurring risk that deputies employing rapid-extraction techniques in confined vehicle environments will cause catastrophic upper-extremity injuries and that post-injury custodial control will exacerbate those injuries.

116.    Prior to February 2024, the County had actual or constructive notice that O'Neill's escalation and extraction practices in low-threat encounters posed a foreseeable risk of serious injury. The June 2023 Ramsey incident involved a substantially similar high-leverage extraction against a non-threatening subject. Upon information and belief, the County's use-of-force reporting and recording systems generated supervisory review opportunities at or near the time of that incident. Despite this notice, the County failed to implement constitutionally adequate corrective measures, retraining, supervision, or restrictions sufficient to

prevent recurrence. Instead, the County conferred "DWI Officer of the Year" on O'Neill at the April 12, 2024 ceremony, after both the June 2023 Ramsey incident and the February 2024 events at issue here, and again at the February 13, 2025 ceremony, thereby ratifying O'Neill's enforcement methods through affirmative public recognition by officials with final policymaking authority. These post-incident awards constitute evidence that the County, through its policymakers, endorsed and ratified the very conduct and enforcement approach that produced the constitutional violations alleged in this action.

117.    Alternatively, Plaintiff alleges that municipal policy is established where an official with final policymaking authority makes a deliberate choice to follow a course of action from among alternatives, including decisions about who is entrusted with training authority and what conduct is modeled and normalized through that authority. On information and belief, the County affirmatively designated O'Neill for field-training and/or trainer functions within specialized DWI enforcement and deployed him in a role carrying institutional authority to model and instruct tactics in live encounters. Plaintiff alleges the challenged extraction and the post-injury custodial conduct occurred in the presence of trainees and proceeded through multiple stages without meaningful correction, supporting the inference that the

tactics used and tolerated were treated as acceptable practices to be learned and replicated.

118.    Plaintiff alleges that these County-level policies, customs, and deliberate training/supervision choices were a moving force behind the constitutional violations because the challenged extraction and post-injury custodial conduct occurred in a scene that was already fully contained and saturated with deputies; the extraction method foreseeably risked catastrophic upper-extremity injury in a confined vehicle environment; and, after the injury became obvious, the custody chain continued through transport, hospital custody, discharge-control, and jail intake without constitutionally adequate restraint, reassessment, or stabilization.

## V. DAMAGES

119.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer the following injuries and damages:

*a.*    Physical injuries, including left glenohumeral dislocation, fracture of the greater tuberosity of the left humerus, displaced fracture fragments requiring ORIF surgery with internal fixation hardware and rotator cuff repair, an approximately eight-inch surgical scar, and continuing pain, limited range of motion, and functional impairment;

*Iraheta v. Montgomery County, Texas et al.*

*b.* Past and future medical expenses, including emergency department treatment, surgical intervention, physical therapy, rehabilitation, and ongoing orthopedic care;

*c.* Physical pain and suffering, both past and future, including acute pain of dislocation and fracture, pain during post-injury custodial handling, and chronic pain from surgical repair and residual impairment;

*d.* Mental anguish, emotional distress, humiliation, and loss of dignity arising from the excessive force, punitive transport conditions, interference with medical care, and incarceration;

*e.* Loss of earning capacity and impairment of ability to work due to permanent left shoulder injury;

*f.* Loss of enjoyment of life and physical impairment.

### VI. PRAYER FOR RELIEF

120.   Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

*a.* Compensatory damages in an amount to be determined by the jury;

*b.* Punitive damages against the individual Defendants in their individual capacities, to the extent permitted by law. Plaintiff does not seek punitive damages against the County;

*Iraheta v. Montgomery County, Texas et al.*

*c.*   Reasonable attorney's fees and costs of court pursuant to federal law;

*d.*   Pre-judgment and post-judgment interest at the highest lawful rate; and

*e.*   Such other and further relief, at law or in equity, as this Court deems just and proper.

## JURY DEMAND

121.   Plaintiff demands a trial by jury on all issues so triable.


*Respectfully submitted,*


**O. RODRIGUEZ LAW, PLLC**


*/s/ Orlando Rodriguez*
**ORLANDO RODRIGUEZ**
State Bar No. 24037382
4900 Fournace Place, Suite 460
Bellaire, Texas 77401
Telephone: (713) 239-2300
Email: efile@orodriguezlaw.com