# EXHIBIT A

Plaintiff's Second Amended Complaint
and Demand for Jury Trial

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| Felix Iraheta, | |
| *Plaintiff,* | Civil Action No. 4:26-cv-01355 |
| v. | |
| Montgomery County, Texas, | Jury Trial Demanded |
| Deputy Joseph Michael O'Neill, | |
| Deputy Nicholas Anthony Scinicariello, | |
| Specialist Timothy J. Boerema, | |
| Deputy Jackson Davis (BWC 16104), | |
| Deputy William Southern (BWC 13603), | |
| Deputy Mario Romero (BWC 15438), | |
| Deputy Carlos Herrera, Jr. (BWC 14218), | |
| Hospital/Scene John Doe Deputy, | |
| Jail John Doe Officers 1–2, | |
| Emily Waddington (LVN), | |
| Etuge Anyangwe (FNP-C), | |
| Zakari Lobe (LVN), | |
| Ather Siddiqi, MD, | |
| | |
| *(All individual defendants are sued in their individual capacities.)* | |
| | |
| *Defendants.* | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT
## AND DEMAND FOR JURY TRIAL

***Preliminary Note:*** *Plaintiff files this Second Amended Complaint solely to substitute the true names of certain previously pleaded BWC-identified defendants consistent with Defendants' Certificate of Interested Parties filed April 2, 2026 (Doc. 16).*

*Other than these substitutions and necessary conforming edits, this pleading is otherwise unchanged from Plaintiff's First Amended Complaint (Doc. 4). The substituted defendants are: Deputy Jackson Davis (BWC 16104), Deputy William Southern (BWC 13603), Deputy Mario Romero (BWC 15438), and Deputy Carlos Herrera, Jr. (BWC 14218). Plaintiff does not rename or remove Hospital/Scene John Doe Deputy or Jail John Doe Officers 1–2.*

## I. PRELIMINARY STATEMENT

1. This federal civil-rights action arises from a forcible vehicle extraction and subsequent custodial force that caused severe orthopedic injury to Plaintiff Felix Iraheta ("Plaintiff"), and from deliberate indifference to Plaintiff's resulting serious medical need, while Plaintiff was in the custody and control of deputies of the Montgomery County Sheriff's Office ("MCSO"), acting under color of state law, on February 20, 2024 and into the early morning hours of February 21, 2024, including during transport, emergency-department processing, discharge, and booking.

2. Plaintiff does not challenge Montgomery County's authority to investigate suspected driving while intoxicated. Plaintiff challenges the manner in which deputies escalated a controlled, nonviolent traffic encounter on the internal loop road of The Woodlands Market Street (9595 Six Pines Drive), a confined retail roadway with frequent stop controls, into a severe orthopedic injury during a high-leverage vehicle extraction. Plaintiff further challenges the continued use of force

and custodial interference with medical stabilization after the injury became apparent.

3. The extraction caused a left glenohumeral dislocation and a fracture of the left humerus/greater tuberosity, diagnosed within hours at Memorial Hermann: The Woodlands Hospital and ultimately requiring operative repair and prolonged rehabilitation. Plaintiff alleges these injuries resulted from objectively unreasonable force applied by Defendant Deputy Joseph Michael O'Neill and Defendant Deputy Nicholas Anthony Scinicariello and were aggravated by subsequent custodial handling and interference with medical stabilization after the injury was obvious.

4. Plaintiff remained continuously in Defendants' custody throughout transport, emergency-department processing, discharge, and booking. The claims in this action arise not only from the initial extraction, but also from the force used and custodial decisions made after Plaintiff's injury was apparent, including the alleged interference with medical stabilization while Plaintiff remained under custodial control.

5. This action asserts municipal liability against Montgomery County. Plaintiff alleges the constitutional violations were the foreseeable result of County policy choices and customs, including an institutional emphasis on arrest volume and County training, supervision, and discipline practices that elevated high-output deputies into specialized enforcement and training-adjacent roles. Plaintiff alleges

these policies and customs foreseeably encouraged rapid escalation and high-risk extraction tactics in routine, low-threat encounters. On information and belief, these policy choices and customs were adopted, maintained, implemented, delegated, and/or ratified by County officials with final policymaking authority for the relevant functions, including the Sheriff of Montgomery County, Texas during the relevant period and the County's governing body responsible for County-level budgeting, contracting, and resource allocation decisions affecting MCSO and jail operations.

6. On information and belief, MCSO created and maintains body-worn camera recordings, in-car video and audio recordings, dispatch and AVL records, and related reports for the incident and custody sequence described herein. These materials are within Defendants' possession, custody, or control, and Plaintiff will seek them in discovery.

7. Plaintiff pleads this action so that it may be adjudicated without requiring any determination that any criminal disposition is invalid. Plaintiff's claims are limited to the manner and degree of force used, the post-injury custodial conduct, and the alleged interference with medical stabilization and care. These claims do not challenge the legality of the stop, the arrest, or any blood-search warrant.

8. Plaintiff seeks compensatory damages; punitive damages against the individual Defendants (not the County); attorneys' fees and costs to the extent permitted by applicable law; interest; and such other relief as the Court deems just.

## II. PARTIES

### A. Plaintiff

9. Plaintiff Felix Iraheta is an adult resident of Montgomery County, Texas. At all relevant times, Plaintiff was approximately 47 years old, approximately 5′6″ tall, and approximately 165 pounds.

### B. Municipal Defendant

10. Defendant Montgomery County, Texas (the "County") is a political subdivision in Texas and is a suable entity.

11. On information and belief, final policymaking authority for the law-enforcement and jail-custody practices implicated by the events alleged herein, including use of force, training, supervision, discipline, and custody operations, rested with the Sheriff of Montgomery County, Texas (the "Sheriff") during the relevant period.

12. On information and belief, final policymaking authority for County-level budgeting, contracting, and resource-allocation decisions affecting the Montgomery County Sheriff's Office ("MCSO") staffing, training resources, and jail medical services contracting and oversight rested with the County's governing body responsible for those decisions.

13. Plaintiff alleges that one or more County officials with final policymaking authority adopted, maintained, implemented, delegated, and/or ratified the policies,

customs, and practices described in this Complaint, and that those policies, customs, and practices were a moving force behind the constitutional violations alleged.

### C. Individual MCSO Defendants

14. Defendant Deputy Joseph Michael O'Neill (Badge/Unit 14838) is a peace officer employed by MCSO. He is sued in his individual capacity. At all relevant times, he acted under color of state law. Plaintiff alleges Deputy O'Neill initiated the vehicle extraction and exercised custodial control over Plaintiff during transport, hospital custody, discharge, and transport to jail.

15. Defendant Deputy Nicholas Anthony Scinicariello (Badge 6067) is a peace officer employed by MCSO. He is sued in his individual capacity. At all relevant times, he acted under color of state law. Plaintiff alleges Deputy Scinicariello participated in the vehicle extraction and post-injury handling.

16. Defendant Specialist Timothy J. Boerema (Unit U1008) is a peace officer who acted under color of state law at the scene. He is sued in his individual capacity. Plaintiff alleges Specialist Boerema initiated the stop and remained present during the post-injury period with a realistic opportunity to request medical assistance and/or intervene.

17. Defendant Deputy Jackson Davis (BWC 16104) is a peace officer employed by MCSO. He is sued in his individual capacity. At all relevant times, he

acted under color of state law. Plaintiff alleges Deputy Jackson Davis was present at the Market Street scene and during hospital custody and had a realistic opportunity to intervene, de-escalate, and/or secure medical stabilization. Plaintiff further alleges Deputy Jackson Davis observed, or should have observed, Plaintiff's obvious shoulder injury and repeated pain complaints during the custodial sequence.

### D. BWC-Identified Defendants

18. Defendant Deputy William Southern (BWC 13603) is an MCSO deputy. He is sued in his individual capacity. Plaintiff alleges this deputy was present at the Market Street scene during the extraction and immediate post-injury handling and had a realistic opportunity to intervene and/or request medical assistance.

19. Defendant Deputy Mario Romero (BWC 15438) is an MCSO deputy. He is sued in his individual capacity. Plaintiff alleges this deputy was present at the Market Street scene, including during the pre-extraction and extraction period, and had a realistic opportunity to intervene and/or request medical assistance once Plaintiff's injury became apparent.

20. Defendant Deputy Carlos Herrera, Jr. (BWC 14218) is an MCSO deputy. He is sued in his individual capacity. Plaintiff alleges this deputy was present at the Market Street scene during the post-injury period and had a realistic opportunity to intervene and/or request medical assistance.

### E. Additional Doe Defendants (Grouped by Location)

21. Defendant Hospital/Scene John Doe Deputy (the deputy who, in the emergency department hallway, warned Plaintiff that noncompliance would "further injure" Plaintiff's shoulder, and who was present during subsequent hospital custody, including at bedside) is an MCSO deputy whose true name is presently unknown. He is sued in his individual capacity. Plaintiff alleges this deputy had reason to know Plaintiff had an acute shoulder injury and had a realistic opportunity to intervene, de-escalate, request medical assistance, and prevent continued objectively unreasonable force and/or interference with medical stabilization. Plaintiff alleges this deputy is distinct from Defendant Deputy Jackson Davis (BWC 16104).

22. Defendants Jail John Doe Officers 1–2 are detention officers whose names are presently unknown. They are sued in their individual capacities. Plaintiff alleges they received Plaintiff into custody after hospital discharge and had reason to know of Plaintiff's obvious serious orthopedic injury, and a realistic opportunity to ensure appropriate intake screening, continuity of care, and stabilization accommodations.

23. Plaintiff will amend this Complaint to substitute the true names of the remaining Doe Defendants once their identities are confirmed through discovery and other information produced in this action.

*F. Jail Medical Defendants*

24. Defendants Waddington, Anyangwe, Lobe, and Siddiqi provided and/or oversaw medical care for detainees at the Montgomery County Jail during the relevant period as part of the jail's medical intake and treatment process.

25. At all relevant times, these defendants acted under color of state law while providing and/or overseeing medical services for detainees at the Montgomery County Jail.

26. Plaintiff's claims in this action are asserted against the named individual jail medical defendants based on their own acts and omissions and not on a vicarious-liability theory.

27. Defendant Emily Waddington (LVN) is a licensed vocational nurse who, on information and belief, performed intake-related medical and/or suicide screening for Plaintiff during booking on February 21, 2024, including documenting and/or routing intake information related to Plaintiff's reported shoulder injury and recent hospital treatment. She is sued in her individual capacity. At all relevant times, she acted under color of state law.

28. Defendant Etuge Anyangwe (FNP-C) is a family nurse practitioner who, on information and belief, modified jail medical tasks and/or appointments for Plaintiff on February 22, 2024, including with respect to follow-up related to

Plaintiff's hospital clearance and shoulder injury. He is sued in his individual capacity. At all relevant times, he acted under color of state law.

29. Defendant Zakari Lobe (LVN) is a licensed vocational nurse who, on information and belief, administered and/or documented medication administration to Plaintiff during Plaintiff's custody on February 21, 2024, while Plaintiff presented with an obvious acute shoulder injury. He is sued in his individual capacity. At all relevant times, he acted under color of state law.

30. Defendant Ather Siddiqi, MD is a physician who, on information and belief, served as a prescriber and/or approving physician reflected in the jail medical record system for orders placed for Plaintiff during Plaintiff's custody, including orders placed in connection with Plaintiff's reported shoulder injury and outside-hospital discharge information. He is sued in his individual capacity. At all relevant times, he acted under color of state law.

31. Plaintiff pleads that each individual defendant is sued for his or her own acts and omissions as alleged in this Complaint.

32. Plaintiff will amend this Complaint to substitute the true names of the remaining Doe Defendants once identified.

## III. JURISDICTION AND VENUE

33. This Court has subject-matter jurisdiction because Plaintiff asserts claims arising under the United States Constitution and federal civil-rights law.

33A. Plaintiff brings his federal constitutional claims pursuant to 42 U.S.C. § 1983.

34. This Court has supplemental jurisdiction over any state-law claims that form part of the same case or controversy, to the extent any such claims are asserted.

35. Venue is proper in this District because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Montgomery County, Texas, within this Division, and because Defendants reside in and/or may be found in this District.

## IV. FACTUAL ALLEGATIONS

### A. Stop Context: Confined Market Street Roadway and Immediate Containment

36. On the evening of February 20, 2024, at approximately 10:45 p.m., Plaintiff departed Uni Sushi within The Woodlands Market Street retail district at or near 9595 Six Pines Drive, The Woodlands, Texas, and drove a short distance within the same complex.

37. Market Street's internal roadway is a confined loop road with frequent stop controls and constrained routes due to storefronts, curbs, and short block

distances. The distance from Plaintiff's departure point to the stop location was approximately 1,400 feet, and remained entirely within the Market Street complex.

38. Specialist Boerema, working an off-duty "extra job" assignment at Market Street in an unmarked vehicle, initiated a stop after observing Plaintiff's vehicle strike a traffic cone and drag it. Plaintiff alleges no objective speed-measurement device was used.

39. Plaintiff's vehicle came to a stop within Market Street. The surface conditions were described in arrest paperwork as flat, level, hard, dry, and free of debris. The vehicle was stationary, and Plaintiff remained seated in the driver's seat.

40. Specialist Boerema requested backup. By the time Deputy O'Neill arrived and made contact, the scene had become saturated with law-enforcement resources. On information and belief, at least six marked patrol SUVs and Specialist Boerema's unmarked unit were present. Deputies stood in a loose perimeter, and Plaintiff's vehicle was effectively boxed in. Plaintiff alleges there was no plausible route of flight and no exigency requiring immediate high-risk physical intervention.

40A. On information and belief, body-worn camera recordings reflect a controlled, non-emergency atmosphere before any physical force was used. On information and belief, at approximately 22:50:38, body-worn camera recordings capture a deputy stating that "all the trainees are here," while Plaintiff's vehicle

remained surrounded by multiple patrol units and deputies maintained a controlled perimeter.

40B. Plaintiff alleges that recordings further reflect a non-emergency atmosphere immediately before the extraction, including casual conversation among deputies and a lack of any observable urgent threat cue.

40C. On information and belief, one or more deputies present were trainees. Plaintiff alleges Deputy O'Neill exercised direction and provided instruction to trainees during the encounter in a manner consistent with a training or training-adjacent role.

40D. On information and belief, the presence and deployment of trainees and training-adjacent instruction reflects pre-incident scheduling, staffing, and assignment decisions rather than an on-the-spot necessity created by any emergent threat.

41. During this period, Plaintiff was attempting to contact his wife to arrange a ride home.

### B. Escalation Decision and Two-Officer Extraction

42. Deputy O'Neill made contact with Plaintiff at the driver's-side door and questioned Plaintiff briefly. Plaintiff declined to answer certain questions. Plaintiff's recorded response to the exit command was, at most, ambiguous, and Deputy O'Neill treated it as a refusal.

43. Despite the controlled perimeter and the presence of multiple officers, Deputy O'Neill announced his intent to forcibly remove Plaintiff, issued a rapid verbal countdown, and initiated a physical extraction before Plaintiff had a meaningful opportunity to comply.

43A. Plaintiff did not threaten the deputies, did not attempt to drive away, and did not make any sudden movements consistent with flight or assault at the moment Deputy O'Neill initiated the extraction.

44. Deputy Scinicariello positioned himself at the driver's-side rear area near the B-pillar before the extraction, consistent with coordinated two-officer positioning for a forcible removal.

45. The extraction occurred rapidly. Deputy O'Neill opened the driver's door, disengaged or manipulated the seatbelt, and, in coordination with Deputy Scinicariello, seized Plaintiff's left arm and began pulling Plaintiff from the vehicle.

46. Deputies O'Neill and Scinicariello used the vehicle's rigid frame as a leverage point while pulling and torquing Plaintiff's left upper extremity as Plaintiff's torso remained partially constrained by the seat and door-frame geometry.

47. Plaintiff suffered an immediate, acute left shoulder dislocation with an associated fracture. Plaintiff audibly cried out and thereafter exhibited signs consistent with severe pain and functional incapacity.

48. Plaintiff alleges that the mechanism of injury was foreseeable because forceful abduction and external rotation of an upper extremity against a fixed fulcrum while the torso is constrained materially increases the risk of glenohumeral dislocation and proximal humerus fracture.

48A. On information and belief, across multiple body-worn camera perspectives, video blurring and/or reduced audio capture occurs at or near critical moments in the extraction, handcuffing, and custodial placement sequence, including during the initial physical engagement, during the handcuffing maneuver, and during the placement of Plaintiff into the patrol SUV.

### C. Post-Injury Handling at the Scene: Continued Force After Injury Becomes Obvious

49. After the extraction, Plaintiff was pulled and/or forced to the ground and then brought to standing for handcuffing. Plaintiff alleges that any body stiffness, bracing, or "tensing" during this period reflected an involuntary protective reaction to an acute orthopedic injury and severe pain, not assaultive resistance.

50. Plaintiff alleges that during handcuffing, Deputy Scinicariello applied additional pressure and leverage to control Plaintiff's left upper extremity despite Plaintiff's obvious injury, increasing pain and the risk of worsening the injury.

51. Plaintiff was placed into Deputy O'Neill's patrol SUV while handcuffed behind his back despite Plaintiff's obvious upper-extremity injury. Plaintiff alleges

Deputy O'Neill used physical force to seat Plaintiff and warned of additional charges if Plaintiff did not move quickly enough.

52. During the post-injury period at the scene, multiple deputies remained nearby and observed Plaintiff's obvious pain and impairment. Plaintiff alleges one or more deputies had realistic opportunities to summon medical assistance and to intervene to stop continued objectively unreasonable force after the injury became apparent.

52A. After the extraction and before placement into the patrol vehicle, Plaintiff was brought to standing in close proximity to multiple deputies, including Specialist Boerema, Deputy Jackson Davis (BWC 16104), Defendant Deputy William Southern (BWC 13603), Defendant Deputy Mario Romero (BWC 15438), and Defendant Deputy Carlos Herrera, Jr. (BWC 14218). Plaintiff alleges he was within only a few feet of these deputies with no material obstructions to their view.

52B. Plaintiff alleges that during this period he clutched his left shoulder, moved slowly, and displayed visible signs of acute injury and distress, including an apparent deformity and functional limitation of the left shoulder and arm. Plaintiff further alleges deputies in the immediate vicinity heard Plaintiff scream when he was lifted and when his injured arm and shoulder were manipulated during post-extraction control and handcuffing.

52C. Plaintiff alleges that despite Plaintiff's visible injury and pain behavior, and despite the presence of multiple deputies with clear line of sight, no deputy summoned prompt medical assessment at the scene, and forceful handling continued during the handcuffing and custodial placement sequence.

52D. Plaintiff alleges that after Plaintiff was placed in the rear of the patrol SUV, Deputy Jackson Davis heard Plaintiff's continued verbal expressions of pain and requests for help.

52E. Plaintiff alleges Deputy Jackson Davis was a trainee working under Deputy O'Neill and was present while Deputy O'Neill read the DIC warnings to Plaintiff. Plaintiff alleges Deputy O'Neill provided instruction to Jackson Davis concerning the DIC warnings process and raised his voice and spoke over Plaintiff while Plaintiff attempted to communicate pain and medical distress.

### D. Transport to Hospital: Pain Complaints and Custodial Suppression

53. During transport, Plaintiff repeatedly complained that his shoulder was injured and "not right," and attempted to get the attention of the transporting officer.

54. Plaintiff alleges Deputy O'Neill acknowledged Plaintiff's complaints and then increased the volume of music during transport, impairing Plaintiff's ability to communicate medical distress while Plaintiff remained handcuffed and in custody.

*E. Hospital Arrival: Obvious Injury and Custodial Control*

55. Plaintiff arrived at the emergency department in police custody. Plaintiff's shoulder deformity and functional limitation were obvious upon arrival and would have been apparent to reasonable observers.

56. Hospital triage documentation reflected that Plaintiff arrived in police custody with a suspected left shoulder dislocation and required medical clearance. Nursing documentation reflected escalating pain scores and documented Plaintiff's inability to move the left shoulder.

57. Deputy O'Neill later characterized Plaintiff's injury as first noticed at the hospital. Plaintiff alleges, however, that recordings and contemporaneous circumstances, including Plaintiff's repeated transport complaints and visible distress shortly after the extraction, demonstrate that Plaintiff's injury and need for medical assessment were apparent before hospital arrival.

57A. On information and belief, body-worn camera recordings reflect that Deputy Jackson Davis (BWC 16104) remained part of the custodial chain from the Market Street scene through hospital arrival. Plaintiff alleges that upon arrival, Plaintiff exited the patrol vehicle slowly, with visible guarding and limited movement consistent with shoulder injury, while still in custody and under deputies' control.

57B. Plaintiff alleges that during hospital entry and early hallway intake, multiple deputies, including Deputy O'Neill and Deputy Jackson Davis, remained

present in close proximity and observed Plaintiff's pain-limited movement and continued guarding of the injured shoulder.

### F. Hospital Hallway Movement: Threats, Dragging, and Bed Restraint

58. In the emergency department hallway, while visibly injured and attempting to comply with instructions and direction, Plaintiff was ordered to move immediately under threat of being carried.

59. Defendant Hospital/Scene John Doe Deputy warned Plaintiff that noncompliance would "further injure" Plaintiff's shoulder, demonstrating awareness of Plaintiff's serious orthopedic injury and the risk that forceful movement would worsen it.

59A. On information and belief, at approximately 00:00:39 during the hospital hallway phase, body-worn camera recordings capture a deputy warning Plaintiff that noncompliance would "further hurt" Plaintiff's shoulder.

60. Deputy O'Neill then used physical force to propel Plaintiff down the hallway while Plaintiff pleaded for the officer to stop and complained about his shoulder.

61. Deputy O'Neill and at least one assisting deputy forced Plaintiff onto a hospital bed, restrained him, and applied control force despite the absence of assaultive resistance.

### G. Compelled Blood Draw: Restraint and Weight-Based Control

62. O'Neill obtained a blood-search warrant as affiant.

62A. Plaintiff does not challenge the collection of a blood specimen pursuant to a warrant. Plaintiff challenges only the manner and degree of force used against him during the blood-draw process and related custodial handling while he was visibly injured and in pain.

63. A nurse obtained a blood specimen from Plaintiff's right hand. Plaintiff alleges that, despite Plaintiff being restrained and in custody, Defendant O'Neill applied restraint force, including bodyweight and two-arm pressure, in a manner that was unnecessary or disproportionate to any legitimate need communicated by medical staff.

63A. On information and belief, recordings from the hospital phase reflect Deputy O'Neill explaining and demonstrating aspects of the blood-draw process to another deputy while Plaintiff was on a hospital bed in visible pain and under custodial control.

64. Plaintiff alleges that any movement described as "resistance," including hand or arm movement during the blood draw, was consistent with involuntary pain response and protective bracing by a person suffering an acute shoulder dislocation and fracture, rather than purposeful aggression or an attempt to prevent evidence collection.

### H. Diagnosis and Emergency Treatment

65. Plaintiff was diagnosed on February 21, 2024 with a left shoulder dislocation and humerus and/or greater tuberosity fracture. A closed reduction was performed. The record reflects that immobilization by sling was ordered and that a sling and/or splint was applied to Plaintiff's left upper extremity.

66. Plaintiff's total time in the emergency department, during which he underwent closed reduction of a dislocated shoulder with associated fracture, received limited oral analgesia, was subjected to a compelled blood draw, and was processed for custodial discharge, was approximately two hours.

### I. Denial of Sling, Removal of Monitors, and Forced Discharge

67. At discharge, O'Neill woke Plaintiff and directed that Plaintiff be removed from the emergency department for transport to jail.

68. Plaintiff alleges O'Neill interfered with medical stabilization at discharge. Plaintiff alleges the emergency-department records and discharge materials reflect that the treating physician ordered immobilization by sling and follow-up care for the fracture and dislocation and that a sling and/or splint was applied during the discharge process.

68A. Plaintiff alleges hospital staff provided O'Neill with Plaintiff's discharge paperwork and O'Neill signed for receipt of the discharge documents.

Plaintiff further alleges that available recordings reflect this exchange and that the discharge paperwork and instructions were not provided to Plaintiff before O'Neill removed Plaintiff from the emergency department in custody.

69. When Plaintiff requested the physician-ordered sling, Plaintiff alleges O'Neill refused and stated that a sling was "not for pain management," thereby overriding the treating physician's stabilization directive. Plaintiff alleges O'Neill removed Plaintiff from the emergency department without ensuring Plaintiff left with the ordered immobilization, removed monitoring equipment, denied Plaintiff's request to see the physician again, re-handcuffed Plaintiff despite the freshly reduced dislocation and fracture, and controlled the timing and manner of Plaintiff's departure while Plaintiff remained in custody.

70. The discharge paperwork bore a handwritten notation "Cleared for jail" while also reflecting discharge instructions prescribing immobilization, orthopedic follow-up, and pain management for the diagnosed fracture and dislocation.

### J. Jail Booking and Intake: Failure to Provide Stabilization Accommodations

71. Plaintiff was transported to the Montgomery County Jail. At intake, Plaintiff was visibly injured, having just been discharged from the emergency department with an acute orthopedic injury diagnosed as a left shoulder dislocation with an associated humerus and/or greater tuberosity fracture, and discharge instructions reflecting immobilization and orthopedic follow-up needs.

72. Plaintiff alleges that intake screening and continuity of care for Plaintiff's obvious medical needs were inadequate under the circumstances. Plaintiff further alleges that, despite the recent emergency-department discharge and the obvious nature of the injury, the jail intake medical workflow, as implemented by jail intake staff and the named jail medical defendants, did not ensure timely reassessment by an appropriate medical provider and did not ensure implementation of stabilization accommodations reasonably required for a detainee with an acute shoulder dislocation and fracture.

73. Jail booking paperwork included a question asking whether Plaintiff had recently been involved in an "accident," and the paperwork reflects a "no" response. Plaintiff alleges the response was truthful and consistent with the mechanism of injury because Plaintiff's shoulder injury was not accidental; Plaintiff alleges it resulted from force applied during the custodial encounter. Plaintiff further alleges the "accident" question is underinclusive and did not operate as a meaningful screening trigger for force-inflicted custodial injuries, thereby reducing the likelihood that the booking process would trigger urgent clinical escalation for a force-inflicted custodial injury.

74. On information and belief, booking and/or intake paperwork was completed by jail staff and presented to Plaintiff for signature as part of intake processing. Plaintiff signed certain forms but did not complete the written entries or

check-box selections reflected on staff-generated intake forms and did not have a meaningful opportunity to review, correct, or refuse staff-completed entries while in custody and in obvious pain.

75. Separate intake screening documentation completed by Defendant Waddington at approximately 02:00 on February 21, 2024 documented "serious injury/hospitalization in last 90 days" and described "dx Shoulder," reflecting that Plaintiff's serious orthopedic injury was documented within the intake screening process.

76. Jail medical records maintained in CorEMR reflect gaps in intake documentation modules, including multiple intake form modules displaying "No Records" for Plaintiff. Plaintiff alleges these gaps impeded continuity of care and reduced the likelihood that a detainee with a known acute orthopedic injury would receive timely provider-level reassessment and stabilization accommodations.

77. The jail medical record stream also contains scanned intake-related documents and outside-hospital records and audit-trail entries reflecting task creation and modification for follow-up related to Plaintiff's shoulder dislocation.

77A. Plaintiff alleges that the jail medical electronic record reflects both (a) outside-hospital records and intake-related documents scanned into Plaintiff's chart in connection with the February 21, 2024 booking and (b) "No Records" displayed in multiple intake form modules. Plaintiff alleges this combination reflects a

breakdown in intake documentation and continuity-of-care workflow as implemented during Plaintiff's booking and early custody and increased the risk that Plaintiff's known acute shoulder dislocation and fracture would not receive timely provider-level reassessment and stabilization accommodations.

78. On information and belief, at approximately 02:44 to 02:45 on February 21, 2024, Defendant Waddington entered a medication order into CorEMR "per hospital paper work" for Plaintiff, reflecting actual awareness that Plaintiff's booking included outside-hospital documentation related to the shoulder injury.

79. On information and belief, CorEMR reflects that a high-priority clinical follow-up task and/or appointment was created for Plaintiff on February 21, 2024, described as follow-up from hospital clearance for custody related to shoulder dislocation, and scheduled for February 22, 2024.

80. On information and belief, Defendant Anyangwe deleted that high-priority follow-up task and/or appointment on February 22, 2024 without ensuring that an appropriate provider-level evaluation occurred or that appropriate follow-up steps were implemented for Plaintiff's known acute orthopedic injury, despite the task's high-priority designation and the known risk of harm from lack of timely reassessment and stabilization accommodations.

### K. Subsequent Medical Treatment and Surgical Repair

81. On February 22, 2024, Plaintiff returned to Memorial Hermann: The Woodlands Hospital emergency department with severe left shoulder pain. Medical documentation from that visit reflects Plaintiff's report that he had been discharged in police custody and had not been provided discharge instructions or a sling. The treating physician documented that Plaintiff had an obvious fracture and was in pain, prescribed pain medication, and provided a correctly sized sling.

82. Plaintiff subsequently obtained orthopedic evaluation and imaging, which documented displacement and fragmentation of the greater tuberosity fracture and recommended surgical intervention.

83. Plaintiff underwent surgery on March 22, 2024. The procedure included left greater tuberosity debridement, open rotator cuff repair, and biceps tenodesis, resulting in permanent internal hardware and an approximately eight-inch surgical scar.

84. Plaintiff underwent prolonged physical therapy and rehabilitation and continues to experience pain, limited range of motion, and functional impairment.

### L. Awards, Incentives, and Institutional Reinforcement (Municipal Context)

85. On information and belief, the Montgomery County District Attorney's Office hosts an annual "Vehicular Crimes Awards" ceremony that recognizes officers and agencies for DWI enforcement output. On information and belief,

Deputy Joseph Michael O'Neill has been publicly recognized at this ceremony on multiple occasions, including for calendar years 2022, 2023, and 2024.

86. Plaintiff alleges that Montgomery County maintained, tolerated, and reinforced an institutional emphasis on DWI arrest volume as a significant measure of performance and prestige, including by rewarding, elevating, and continuing to deploy high-output DWI deputies in specialized enforcement and training-adjacent roles. Plaintiff further alleges that this institutional emphasis foreseeably encouraged rapid escalation and high-risk tactics in low-threat encounters, and that the County's reinforcement of this emphasis was a moving force behind the unconstitutional uses of force alleged in this Complaint.

### M. Notice Regarding Similar Extraction Conduct (Pre-Incident Context)

87. On information and belief, on June 30, 2023, approximately eight months before the events at issue, Deputy Joseph Michael O'Neill was involved in a substantially similar vehicle-extraction incident in The Woodlands that involved leveraged control force against a non-threatening subject.

88. On information and belief, under Montgomery County's use-of-force reporting, recording, and internal review practices, that June 30, 2023 incident was required to be documented and subjected to supervisory and/or command review at or near the time it occurred, placing the County and its policymakers on notice of the conduct at issue.

89. Plaintiff alleges that, before February 2024, Montgomery County had actual or constructive knowledge that Deputy O'Neill had employed dangerous, high-leverage extraction tactics against non-threatening subjects and that such tactics posed a foreseeable risk of serious bodily injury, yet the County failed to take reasonable corrective action.

90. Plaintiff alleges that, despite this notice, Montgomery County failed to retrain, supervise, restrict, decertify, or discipline Deputy O'Neill; failed to modify extraction training, guidance, or oversight to address the known risk; and continued to deploy Deputy O'Neill in specialized DWI enforcement and training-adjacent roles, thereby acting with deliberate indifference to the constitutional rights of persons with whom deputies would come into contact and making the February 2024 excessive-force violations a highly foreseeable consequence of the County's inaction.

### N. Recording Discontinuities

91. On information and belief, across multiple body-worn camera and patrol-vehicle recordings, the audio and/or video feeds reflect discontinuities at critical moments, including apparent muting or reduced audio capture and instances of blurring or missing segments. Plaintiff alleges these discontinuities warrant forensic review of original files and associated metadata, production of native-format recordings, and preservation and production of any audit logs or access logs

reflecting recording activation, deactivation, muting, buffering, edits, exports, uploads, redactions, and chain-of-custody events.

### O. Alternative Pleading: Constitutional Framework for Hospital-Phase Force

92. Plaintiff pleads the hospital-phase use of force in the alternative to avoid forfeiture based on how the Court characterizes Plaintiff's custody status during the post-extraction period. Plaintiff alleges that, after the vehicle extraction and during transport and hospital custody, he remained continuously restrained and under officers' arrest authority, and the force used against him during that time was objectively unreasonable and therefore actionable as excessive force during an ongoing seizure. Alternatively, to the extent the Court concludes that the arrest was complete before the hospital-phase force and Plaintiff's status had transitioned to that of a pretrial detainee, Plaintiff alleges that the same force was objectively unreasonable and therefore violated due process. In either constitutional framework, the relevant inquiry is whether the force used was objectively unreasonable in light of the circumstances, including Plaintiff's restraint status, the absence of any immediate threat, and the known shoulder injury.

### P. Chronology Summary

93. Body-worn camera recordings, patrol-vehicle recordings, dispatch/CAD logs, jail intake records (including CorEMR entries), and hospital records contain

timestamps and contemporaneous data that will corroborate the sequence, duration, and circumstances of the events alleged.

94. Vehicle Extraction (approximately 10:51 p.m., February 20, 2024). Deputy O'Neill issued a rapid verbal countdown and, with Deputy Scinicariello positioned at the rear driver's side near the B-pillar, forcibly extracted Plaintiff from the vehicle. Plaintiff suffered an immediate left shoulder dislocation and fracture.

95. Post-Extraction Ground Custody and Handcuffing (immediately following extraction). Plaintiff was forced to the ground and handcuffed behind his back despite an obvious upper-extremity injury. Deputy Scinicariello applied additional pressure during handcuffing. Multiple deputies observed Plaintiff's condition and did not summon prompt medical assessment or assistance.

96. Placement in Patrol Vehicle Under Threat (shortly after handcuffing). Deputy O'Neill used pushing force to seat Plaintiff in the patrol SUV while Plaintiff remained handcuffed behind his back, and warned Plaintiff of additional charges if Plaintiff did not move quickly enough.

97. Transport: Pain Complaints Suppressed (during transport). Plaintiff repeatedly complained that his shoulder was injured. Deputy O'Neill acknowledged the complaints and then increased the music volume, with the foreseeable effect of impairing Plaintiff's ability to communicate medical distress.

98. Emergency Department Hallway Force (upon arrival). At the hospital, Defendant Hospital/Scene John Doe Deputy warned Plaintiff that noncompliance would further injure Plaintiff's shoulder. Deputy O'Neill then used physical force to propel Plaintiff down the hallway while Plaintiff pleaded for him to stop.

99. Forced Bed Restraint and Blood Draw (inside the emergency department). Deputy O'Neill and at least one assisting deputy forced Plaintiff onto a bed and restrained him. During a compelled blood draw, Deputy O'Neill applied bodyweight and two-arm pressure despite the absence of any communicated necessity from medical staff.

100. Denial of Sling and Override of Physician Directive (at discharge). Deputy O'Neill refused Plaintiff's request for a physician-ordered sling, removed monitoring equipment, denied Plaintiff's request to see the physician again, and re-handcuffed Plaintiff after reduction and diagnosis of dislocation and fracture.

101. Forced Discharge and Transport to Jail (early morning, February 21, 2024). Deputy O'Neill directed Plaintiff's removal to jail and pushed Plaintiff through the hospital and into the patrol SUV without the ordered immobilization.

102. Jail Intake Without Stabilization Accommodations (following transport). Jail staff received Plaintiff with an obvious orthopedic injury and hospital discharge paperwork prescribing immobilization, yet failed to provide constitutionally adequate intake screening and stabilization accommodations.

102A. Upon arrival at the Montgomery County Jail following hospital discharge, Plaintiff remained in obvious orthopedic distress and had recently generated hospital discharge paperwork reflecting a left shoulder dislocation with associated fracture and follow-up instructions. Plaintiff alleges that during booking, jail medical staff entered in the jail medical record system that a new medication order was added "per hospital paper work," and contemporaneous screening documentation noted "serious injury/hospitalization" with "dx Shoulder," demonstrating awareness of Plaintiff's hospital-treated shoulder injury. Plaintiff further alleges that despite this known injury, the intake process lacked a complete, documented medical intake screening and failed to implement basic stabilization accommodations for Plaintiff's shoulder injury.

## V. CAUSES OF ACTION

### COUNT I

**Excessive Force During Seizure—Extraction and Immediate Post-Injury Handling**

*(Against Defendant O'Neill)*

103. Plaintiff incorporates by reference all preceding paragraphs.

104. Plaintiff alleges that Defendant Deputy Joseph Michael O'Neill used objectively unreasonable force by initiating and executing a high-leverage vehicle extraction against a stationary, non-fleeing occupant on a confined retail roadway, in a scene already saturated with law-enforcement resources, and by escalating to physical extraction before Plaintiff had a meaningful opportunity to comply with verbal commands.

105. Plaintiff was not threatening officers, was not armed, and had no means of flight. Plaintiff alleges the governmental interest in immediate forcible extraction was minimal under the circumstances.

106. Plaintiff alleges Deputy O'Neill used the rigid vehicle frame as a mechanical leverage point against Plaintiff's left upper extremity, causing an immediate left shoulder dislocation and fracture.

107. Plaintiff further alleges that after the extraction, Deputy O'Neill continued to apply objectively unreasonable force during post-injury handling, including forcing

Plaintiff into a patrol vehicle while handcuffed behind his back despite the obvious upper-extremity injury.

108. As a direct and proximate result of Deputy O'Neill's objectively unreasonable force, Plaintiff suffered the injuries and damages described herein.

## COUNT II
### Excessive Force During Seizure—Extraction Participation and Post-Injury Handling
*(Against Defendant Scinicariello)*

109. Plaintiff incorporates by reference all preceding paragraphs.

110. Plaintiff alleges that Defendant Deputy Nicholas Anthony Scinicariello used objectively unreasonable force by participating in the vehicle extraction, including by positioning at or near the rear driver-side door-frame/B-pillar area and applying leveraged force against Plaintiff's left upper extremity in coordination with Deputy O'Neill.

111. Plaintiff alleges Deputy Scinicariello's participation was integral to the mechanism of injury and was a direct and proximate cause of Plaintiff's immediate left shoulder dislocation and associated fracture.

112. Plaintiff further alleges that, after the extraction and once Plaintiff's injury was obvious, Deputy Scinicariello applied additional pressure and leverage during post-extraction handcuffing and control, aggravating pain and creating a foreseeable risk of worsening Plaintiff's injury, despite the absence of assaultive resistance.

113. As a direct and proximate result of Deputy Scinicariello's objectively unreasonable force, Plaintiff suffered the injuries and damages described herein.

## COUNT III

**Excessive Force During Seizure—Post-Extraction Force Through Hospital Custody**

*(Against Defendants O'Neill, Jackson Davis, and Hospital/Scene John Doe Deputy)*

114. Plaintiff incorporates by reference all preceding paragraphs.

115. Plaintiff alleges that Defendants Deputy Joseph Michael O'Neill, Deputy Jackson Davis (BWC 16104), and Defendant Hospital/Scene John Doe Deputy used objectively unreasonable force after Plaintiff's shoulder injury was obvious, including during hallway movement under threat, physical propulsion while Plaintiff pleaded for the officer to stop, forced bed restraint, and weight-based control during the compelled blood draw.

115A. Plaintiff alleges that Deputy Jackson Davis (BWC 16104) and Defendant Hospital/Scene John Doe Deputy each directly participated in, or actively assisted and facilitated, the application of the challenged force during one or more of these episodes, rather than merely being present.

116. Plaintiff alleges this force was applied while Plaintiff was visibly injured, restrained and in custody, was attempting to comply, and posed no threat, and was therefore objectively unreasonable.

117. As a direct and proximate result of Defendants' objectively unreasonable force, Plaintiff suffered additional pain, aggravation of injury, and damages.

## COUNT IV

### Alternative Excessive Force—Hospital Phase as Pretrial Detainee

*(Against Defendants O'Neill, Jackson Davis, and Hospital/Scene John Doe Deputy)*

118. Plaintiff incorporates by reference all preceding paragraphs.

119. In the alternative, to the extent the Court determines that Plaintiff's custody status had transitioned to that of a pretrial detainee during the hospital phase, Plaintiff alleges that the hospital-phase force described above was objectively unreasonable under the circumstances.

119A. Plaintiff alleges that Defendants' use of force during the hospital phase was purposely or knowingly used against Plaintiff and was objectively unreasonable in light of the facts and circumstances confronting Defendants, including Plaintiff's visible shoulder injury, Plaintiff's custodial restraint status, and the absence of any immediate threat or assaultive resistance.

120. As a direct and proximate result of Defendants' objectively unreasonable force, Plaintiff suffered the injuries and damages described herein.

## COUNT V

## Deliberate Indifference to Serious Medical Needs

*(Against Defendants O'Neill; Waddington; Anyangwe; Lobe; Siddiqi; Jail John Doe Officers 1–2)*

121. Plaintiff incorporates by reference all preceding paragraphs.

122. Plaintiff's left shoulder dislocation and associated fracture constituted an objectively serious medical need. Plaintiff challenges the acts and omissions of the named Defendants in responding to that serious medical need while Plaintiff remained in custody.

123. Plaintiff alleges Defendant Deputy Joseph Michael O'Neill was aware of a substantial risk of serious harm because Plaintiff's deformity and functional impairment were visible and Plaintiff repeatedly complained of severe pain.

124. Plaintiff alleges that, despite this knowledge, Deputy O'Neill disregarded the substantial risk by continuing coercive custodial measures that increased pain and risk and by intentionally interfering with medical stabilization at discharge, including refusing the physician-ordered immobilization, removing monitoring equipment, denying Plaintiff's request to see the physician again, re-handcuffing Plaintiff after reduction and diagnosis of dislocation and fracture, and forcing Plaintiff's removal from the emergency department without ensuring ordered immobilization.

125. Plaintiff alleges Defendants Jail John Doe Officers 1–2 had actual awareness of Plaintiff's obvious serious orthopedic injury, including visible injury and accompanying hospital discharge materials, and nonetheless failed to take reasonable steps within their authority to ensure constitutionally adequate intake screening, continuity of care, and stabilization accommodations.

126. Plaintiff alleges Defendant Emily Waddington (LVN) had actual awareness of Plaintiff's serious medical need as reflected by intake screening documentation and the entry of medication orders based on outside-hospital paperwork. Plaintiff further alleges Defendant Etuge Anyangwe (FNP-C) had actual awareness of Plaintiff's serious medical need as reflected by the high-priority follow-up task tied to shoulder dislocation and hospital clearance.

127. Plaintiff alleges Defendant Waddington, despite actual awareness of Plaintiff's serious medical need at intake, failed to ensure timely provider-level reassessment and stabilization accommodations were routed and implemented during booking and early custody. Plaintiff further alleges Defendant Anyangwe, despite actual awareness of Plaintiff's serious medical need and the purpose of the high-priority shoulder-dislocation follow-up, deleted that high-priority follow-up task and/or appointment without ensuring appropriate provider evaluation and follow-up were implemented.

128. Plaintiff alleges Defendant Zakari Lobe (LVN) encountered Plaintiff during custody while Plaintiff presented with an obvious acute shoulder injury and, on information and belief, had access to Plaintiff's intake medical information and outside-hospital paperwork in the jail medical record system. Plaintiff alleges Lobe therefore had actual awareness of the serious medical need and the substantial risk of harm from lack of reassessment and stabilization accommodations, yet failed to take reasonable steps within his authority to secure reassessment and stabilization accommodations.

129. Plaintiff alleges Defendant Ather Siddiqi, MD, as the prescriber and/or approving physician reflected in the jail medical record, was aware of Plaintiff's serious orthopedic injury and failed to ensure constitutionally adequate clinical evaluation and follow-up measures were implemented. On information and belief, Defendant Siddiqi had access to and/or reviewed the outside-hospital records and/or jail medical tasking reflecting Plaintiff's shoulder dislocation and fracture and approved, countersigned, or supervised orders reflecting that condition, giving him actual awareness of the serious medical need and the substantial risk of harm from inadequate evaluation and follow-up. Plaintiff further alleges Siddiqi failed to ensure provider-level reassessment occurred within a reasonable time and failed to ensure appropriate stabilization instructions, restrictions, and accommodations were implemented.

130. Plaintiff alleges that the jail medical intake, documentation, and follow-up process, as implemented during Plaintiff's booking and early custody by the individual

jail medical defendants and jail intake staff acting under color of state law, foreseeably created a substantial risk that detainees with obvious serious acute injuries would not receive timely screening, provider-level reassessment, stabilization accommodations, and follow-up. Plaintiff further alleges that this risk materialized here through the acts and omissions of the individual jail medical defendants, including failures to ensure continuity of care from the outside-hospital discharge instructions, to route or complete timely clinical reassessment, and to implement reasonable stabilization accommodations for Plaintiff's known shoulder dislocation and fracture.

131. As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's serious medical needs, Plaintiff suffered additional pain, delayed treatment, aggravation of injury, and damages.

## COUNT VI

### Failure to Intervene

*(Against Defendants Boerema, Jackson Davis, Deputy William Southern (BWC 13603), Deputy Mario Romero (BWC 15438), Deputy Carlos Herrera, Jr. (BWC 14218), and Hospital/Scene John Doe Deputy)*

132. Plaintiff incorporates by reference all preceding paragraphs.

133. Plaintiff alleges that Defendants Specialist Timothy J. Boerema, Deputy Jackson Davis (BWC 16104), Defendant Deputy William Southern (BWC 13603), Defendant Deputy Mario Romero (BWC 15438), Defendant Deputy Carlos Herrera, Jr.

(BWC 14218), and Defendant Hospital/Scene John Doe Deputy were present during one or more phases of the post-injury custodial period and had a realistic opportunity to request medical assistance and to intervene to prevent the continued use of objectively unreasonable force against Plaintiff after Plaintiff's shoulder injury became obvious.

134. Plaintiff alleges these Defendants observed Plaintiff's obvious shoulder injury, repeated pain complaints, and the continued use of force and custodial handling that posed a substantial risk of worsening Plaintiff's injury.

135. Plaintiff alleges that notwithstanding this knowledge and opportunity, these Defendants failed to take reasonable steps within their authority to stop or mitigate the force, to request medical assessment or assistance, and to prevent interference with medical stabilization while Plaintiff remained under their control.

135A. As a direct and proximate result of these Defendants' failure to intervene, Plaintiff suffered additional pain, aggravation of injury, delayed stabilization, and damages.

## COUNT VII

## Municipal Policy and Custom Liability

*(Against Defendant Montgomery County, Texas)*

136. Plaintiff incorporates by reference all preceding paragraphs.

137. Plaintiff brings this claim pursuant to federal civil-rights law and seeks to hold the County liable only for its own policies, customs, practices, and deliberate choices that were a moving force behind the constitutional violations alleged, and not on a vicarious-liability theory.

138. Plaintiff alleges the County, acting through one or more officials with final policymaking authority, maintained and tolerated customs and practices that foreseeably encouraged rapid escalation and high-risk extraction tactics in contained, low-threat settings. Plaintiff alleges this practice was persistent and widespread and was known to, and tolerated by, the County's final policymakers.

138A. Plaintiff alleges that these customs and practices are further reflected by the institutional reinforcement of high-output DWI enforcement described above and by the County's prior notice of substantially similar extraction conduct involving Deputy O'Neill in 2023 and the supervisory review opportunities associated with that incident.

138B. On information and belief, the County maintained and tolerated practices in which body-worn camera recordings associated with uses of force reflect blurring,

muting, reduced audio capture, and/or other discontinuities at critical moments, and the County failed to implement and enforce constitutionally adequate training, supervision, and auditing controls to ensure complete, reliable recordings and preservation of native files and audit logs.

139. Plaintiff alleges the County's training, supervision, and discipline practices were constitutionally deficient, reflected deliberate indifference to the rights of persons with whom deputies come into contact, and were closely related to and a moving force behind Plaintiff's injuries. Plaintiff alleges the deficiencies included inadequate instruction and supervision regarding de-escalation alternatives to forcible extraction in contained settings; management of arrestees with obvious orthopedic injuries during transport and hospital custody; and the obligation to refrain from interfering with physician-ordered medical stabilization.

140. Plaintiff alleges the County had actual or constructive notice, prior to February 2024, that Deputy O'Neill's extraction tactics in low-threat encounters posed a foreseeable risk of serious injury, including notice generated by a substantially similar 2023 extraction-related incident and the review opportunities associated with that incident.

141. Plaintiff alleges that, despite this notice and the opportunity to implement corrective measures, the County failed to implement constitutionally adequate retraining, supervision, restrictions, and discipline sufficient to prevent recurrence, and

continued to deploy Deputy O'Neill in roles and assignments that carried institutional authority and influence. Alternatively, Plaintiff alleges that one or more final policymakers deliberately chose to continue deploying Deputy O'Neill in these roles notwithstanding known risks.

141A. Plaintiff alleges that the County's deployment of Deputy O'Neill in a training or training-adjacent role, including in custodial encounters involving trainees, and the County's continued deployment of Deputy O'Neill in such roles despite prior notice of high-risk extraction conduct, reflected deliberate indifference and contributed to the constitutional violations alleged.

142. Plaintiff alleges that these policies, customs, and deliberate choices were the moving force behind the constitutional violations and resulting harm.

## VI.
## DAMAGES

143. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer the following injuries and damages:

144. Physical injuries, including a left glenohumeral dislocation and a fracture of the greater tuberosity of the left humerus, with displaced fracture fragments requiring surgical intervention, including greater tuberosity debridement, open rotator cuff repair, and biceps tenodesis with internal fixation hardware, resulting in an approximately

eight-inch surgical scar and continuing pain, limited range of motion, and functional impairment.

145. Past and future medical expenses, including emergency department treatment, surgical intervention, physical therapy, rehabilitation, and ongoing orthopedic care.

146. Physical pain and suffering, past and future, including acute pain associated with dislocation and fracture; pain during post-injury custodial handling; and chronic pain associated with surgical repair and residual impairment.

147. Mental anguish, emotional distress, humiliation, and loss of dignity arising from the excessive force, custodial threats and coercion, interference with medical care, and incarceration.

148. Loss of earning capacity and impairment of ability to work due to permanent left shoulder injury.

149. Loss of enjoyment of life and physical impairment.

## VII.
### PRAYER FOR RELIEF

150. Plaintiff respectfully requests judgment in his favor and against Defendants, and an award of the following relief:

151. Compensatory damages in an amount to be determined by the jury.

152. Punitive damages against the individual Defendants, to the extent permitted by applicable law. Plaintiff does not seek punitive damages against the County.

153. Reasonable attorney's fees and taxable costs, to the extent permitted by applicable law.

154. Pre-judgment and post-judgment interest at the highest lawful rate.

155. Such other and further relief, at law or in equity, as the Court deems just and proper.

## VIII.
## JURY DEMAND

156. Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**O. RODRIGUEZ LAW, PLLC**

*/s/ Orlando Rodriguez*
**ORLANDO RODRIGUEZ**
State Bar No. 24037382
700 Louisiana St., Suite 3950
Houston, Texas 77002
Telephone: (713) 239-2300
Email: efile@orodriguezlaw.com

ATTORNEY FOR PLAINTIFF